(115 So. 176)

## AMERICAN SURETY CO. v. PRYOR.
### (6 Div. 410.)

Supreme Court of Alabama.    June 23, 1927.

Rehearing Denied Jan. 28, 1928.

**1. Malicious prosecution ⬥⟹3—One causing Information to be given to prosecuting officer as to embezzlement held not liable for malicious prosecution on indictment.**

Surety company which caused information to be given prosecuting officer relative to embezzlement by principal of employer's money is not liable, in action for malicious prosecution under indictment returned by grand jury, where state's officer and grand jury made independent investigation.

**2. Malicious prosecution ⬥⟹3—Co-operative design between employer and employee's surety to bring facts of employee's embezzlement before solicitor held not conspiracy to instigate malicious prosecution.**

Co-operative design between employer and employee's surety to bring all facts of employee's embezzlement before solicitor, through witnesses who knew them at first hand, to be presented to grand jury for their independent action on such testimony, was in no sense conspiracy to instigate malicious prosecution.

**3. Appeal and error ⬥⟹1097(2)—Court's erroneous conclusion on former appeal, founded on misconception of testimony, held not controlling on subsequent appeal.**

Court's erroneous conclusion on former appeal, due to misconception of testimony, is not controlling on subsequent appeal, notwithstanding that evidence was substantially the same.

**4. Malicious prosecution ⬥⟹58(1)—Defendant's letter stating prosecutions for thefts by corporation's employees were difficult held irrelevant to issues in malicious prosecution.**

In action for malicious prosecution, excerpt from letter of defendant stating that prosecutions were difficult in South, especially where there were thefts by corporation's employees, *held* irrelevant to issues, and inadmissible.

**5. Malicious prosecution ⬥⟹67—Prosecutor is liable to accused for damage from proper acts in arresting, keeping, and handling accused.**

Prosecutor is liable to accused for all legally recognized elements of damage resulting from proper and lawful acts of officer in arresting, keeping, and handling accused, if such acts are natural and probable incidents of arrest and custody under existing conditions.

**6. Malicious prosecution ⬥⟹62—Plaintiff's evidence that officer refused to allow him to remove handcuffs to eat held admissible in malicious prosecution.**

In action for malicious prosecution, evidence that, after arrest, officer took plaintiff to dining room, but refused to let him take handcuffs off to eat, *held* admissible, where that item of damage was comprehended in special items counted on in complaint, since question whether officer's conduct was wrongful was for jury.

Brown, J., dissenting.

Anderson, C. J., and Gardner, J., dissenting in part.

Appeal from Circuit Court, Jefferson County; Roger Snyder, Judge.

Action for malicious prosecution by W. F. Pryor against the American Surety Company and others. From a judgment for plaintiff, the named defendant appeals. Reversed and remanded.

Statement by SOMERVILLE, J.:

The plaintiff was an employee of the Standard Oil Company at Montgomery, and the defendant was surety on his bond for the faithful discharge of his duties.

In August, 1920, the employer company discovered irregularites and shortages in the business conducted under Pryor, and, after investigation by its district manager, D. H. Bohler, responsibility was charged against Pryor, and he was discharged from his employment.

The employer company then demanded and received from the surety company the sum of $1,963.61 as indemnity for the shortages of Pryor, and Bohler made to J. V. Keating, the traveling inspector of the surety company, the following written statement of the facts in the case:

"Standard Oil Company.
"Birmingham, Ala., May 13, 1921.
"File No. 1260.  W. F. Pryor.

"Mr. J. V. Keating, Service Manager, American Surety Company, Montgomery, Ala.—Dear Mr. Keating: Your letter of May 11th, replying to ours of May 10th, received. While we do not think it necessary to submit a written statement, yet since you insist upon such a procedure, we are giving you hereinafter, the most important facts in connection with the Pryor shortage:

"Mr. W. F. Pryor was installed as our Montgomery agent on September 1, 1919. He was checked out on August 17, 1920, but we paid him his salary up to and including August 31st, 1920. Mr. D. G. Hubert, former agent Montgomery, and at present connected with our Birmingham office, took the inventory on August 17, 1920, on which Mr. Pryor was checked out. From the time of Mr. Pryor's installation up to and including June 30, 1920, the stocks, fireproof and crown gasoline, checked out reasonably satisfactorily. The audits of these stocks during that period, however, were made in the Birmingham office by inventories furnished by Mr. Pryor or his clerks. The inventory as of July 31, 1920, was taken by our salesman, Mr. A. L. Gibson, together with Mr. Pryor. When we applied inventory dated July 31, 1920, taken by our salesman, Mr. A. L. Gibson, we developed a shortage of approximately: Fireproof oil (kerosene) 2,000 gallons, crown gasoline 4,400 gallons.

"We took up with Mr. Pryor the question of this loss, and he denied emphatically that any

⬥⟹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

shortage actually existed, but insisted that there was something wrong with the accounting. He finally checked over his stock himself, and practically verified our calculations. He stated he was unable to explain what was evidently an actual shortage. We finally sent Mr. Hubert from this office at Birmingham to investigate, and he developed that the inventory as of June 30th had been changed or plugged. It is apparent that, when Mr. Pryor took the inventory on June 30th, he recorded on his inventory sheet the correct number of inches in each tank, but, after figuring on the stocks, he found that to submit the inches he had actually taken would reveal the loss, so he changed the inches in the tankage on the original sheet of the inventory he sent to this office, so as to cover up the loss for June. The carbon copy of the inventory which was retained at Montgomery was not changed, and it was found that, had the inches shown on the carbon copy at Montgomery been applied, then, as already stated, we would have found this loss in June. It is therefore quite apparent that Mr. Pryor had knowledge that this loss existed, at least in June. The inventory of June 30th, original and duplicate, which was changed, the original, which we use in this office, showing one thing, and the carbon retained at Montgomery showing another, was submitted with other evidence to our home office at Louisville, so we assume that your company is in possession of these documents.

"Mr. Pryor, as agent, had $200, which we termed station cash fund, which we supplied for current operating expenses. When we checked him out, he was short this entire amount. There was also what we term tank wagon drivers' cash fund $40, which Mr. Pryor was likewise short. Mr. Pryor had been furnished with a $25 salesman's cash fund, to defray his current expenses; he was short this amount.

"Mr. Pryor entered into secret agreement with the Sweet Dreams Company, Montgomery, to refund them 1 cent per gallon on all kerosene they purchased from this company. This may not be regarded strictly as a dishonest act, but it was certainly a positive violation of this company's instructions. At the time of Mr. Pryor's leaving the company, they had purchased 4,950 gallons kerosene, on which quantity Mr. Pryor had not given them refund of 1 cent per gallon, so we had to refund them $49.50.

"There is a check transaction, J. S. J. Sanders, Victoria, Ala., account Gilbert & Barker. It appears that the amount of this check was misapplied. In order that you may understand this, I am attaching copy of our letter dated January 19, 1921, addressed to Mr. S. W. Coons, our president, subject 'J. S. J. Sanders, Victoria, Ala., account G & B.'

"Mr. A. R. Gilbert, ex-tank wagon driver, has made affidavit to the effect that on one or more occasions he has taken gasoline from plant, sold the gasoline, and turned the proceeds over to Mr. Pryor. No record was made of the delivery to him at the plant, and no record was made of the sale on the regular form, but the gasoline was loaded into the wagon, hauled, and sold, and the money turned over to Mr. Pryor.

"Very truly yours,

"[Signed] D. H. Bohler, District Mgr."

This statement was made at the request of Keating, with a view to getting the case before the solicitor for his investigation.

As to the attitude of the defendant company, its board chairman, in December, 1920, wrote to the employer company as follows:

"If Pryor has been an embezzler of your money, or property, as we believe, it does not seem right that he should go unpunished if his offense against the state of Alabama could be proved, so we suggested that your company lay all the data and evidence before the local prosecuting attorney, and let that official determine whether there have been infractions of the criminal laws of the state of Alabama, and, if so, upon his direction to cause your employees to appear and testify on information and belief as to the facts in their possession, to the end that the state might prosecute him in such manner as the prosecuting attorney might elect. You perceive that this company has no evidence. It has no admissions of any kind of the delinquent. It is merely surety, and its employees are one step removed from the original evidence, documentary or otherwise, which is in the possession of your company. In other words, the state requires first hand, not secondary, evidence.

"Prosecutions are difficult in the South, especially where thefts have been by employees of corporations, railroads, and oil companies, particularly, and local juries are very lenient with those who misappropriate property of corporations, but it would seem to be worth while to submit all the data in this case, with the names of witnesses, to the prosecuting attorney, to see whether this man, Pryor, has offended against the state of Alabama, and can be successfully prosecuted by that official for his crime."

The events leading up to the finding of the indictment against plaintiff are thus narrated by W. T. Seibels, the state's solicitor:

"I do recollect of having a conversation with Mr. Bohler some time during 1921 with reference to Mr. Pryor and the conduct of his agency for the Standard Oil Company in Montgomery. It was some time, I think, in early March or in February, late February, of 1921, I have not got a very good recollection, gentlemen of the jury, but this is the best of my recollection, which I think is substantially true: Mr. Bohler came to my office, I think, the first time either alone or with Mr. Cravey. Cravey had taken charge of the local office, the Standard Oil Company office, at that time. He reported that he had made an investigation of that gentlemen's account, Pryor's account, and that it appeared to him from his investigation that there was a shortage of something like $1,700 worth of oil and $250, approximately, of cash money which was put into his custody to do the local daily business of the company; and he said that he—he just gave it to me for what it was worth—and he gave me the names, I think, of some witnesses and of the people who worked at the Standard Oil Company's office there at Montgomery and at that time with the defendant Pryor. I don't know how long he stayed in my office. He asked me if I thought it was worth investigating, and I told him I thought it was, and that he would hear from me later, some time before the grand jury met. He signified that he might come back to see me again. I don't know whether I took the names at that time of all the witnesses or not. Subsequent to that time he came to my office with Mr. Keating, whom I had never seen. I had seen him before, but that was the first time he

came there; he came there with Mr. Bohler. And I think at that time Mr. Bohler had a report of an inventory which Pryor made to the Birmingham office. I think it from my recollection. I am sure that he had a report that was made by Pryor to the Birmingham office, either that or a copy. This report, the original, showed that it had been tampered with, the figures had been changed from the carbon copy of the original; the carbon had not been changed. He had, I think, some other statements or papers as to the measurements of the tankage which he took, when he went in charge of the company's business, and in which he gave a receipt for the exact number of gallons of oil; and he had a report of the investigator or special man that they send around to check up in August or some time later that year, which showed that he was $1,700 short—$1,700 worth of oil short, that is, the tankage measurement showed it. I decided from that, just from what Bohler had told me. Keating had nothing to say, it was hearsay testimony with Keating; he didn't know anything about it only what Bohler had reported to him. I think his company, the American Surety Company, had paid his defalcation, the shortage. I am not sure of that, but I think that is what he told me, and I thereupon—I don't know, I think I docketed the case, I put it on the grand jury docket then. Some time after that I subpœnaed the witnesses myself to appear before the grand jury in the investigation of this charge or this statement which Bohler had made to me about his shortage. I had all the witnesses before the grand jury. I don't think Bohler was before the grand jury—I think Cravey was. I know Keating wasn't—and the grand jury on my recommendation indicted him for stealing $250 in money and $1,700 worth of oil, shortage, you know, the value of the oil. By oil I mean gasoline; and there was some shortage of kerosene oil, some shortage of different kinds of oil. I believe I had before the grand jury his statement or his what-you-call-em to the Birmingham office, and I had the carbon which showed that the figures unquestionably had been tampered with; I don't know who tampered with them, but it purported to be his report. The grand jury on my recommendation, as solicitor of the county, charged with the enforcement of the law, indicted him. Before I presented it to the grand jury I talked to some of the witnesses. I know I talked to Cravey about his investigations and what he himself knew. I talked to—I don't know whether they had any of those drivers there or not, I am not sure of that, there may have been more than Cravey, of that I am uncertain. But I know I had that documentary evidence there, backed up by what Cravey said and what Bohler had given me in the first conversation; and I reached the conclusion, as the prosecuting attorney of Montgomery County, that this man should be indicted and convicted. I did, indeed, reach that conclusion before I presented the evidence to the grand jury. I was convinced of it from the testimony of the witnesses. I presented the evidence to the grand jury on which I based my opinion and conclusion. The grand jury had the same evidence that I had, only except Bohler; and Bohler didn't know anything, though, except hearsay testimony. I did form my opinion from my interviews with the witnesses and my examination of the papers, that Bohler had examined and seen in it. Mr. Keating did not appear before the grand jury. No representative of the defendant here, the American Surety Company, appeared before the grand jury."

The undisputed evidence showed that neither Bohler nor Keating were witnesses before the grand jury, and that neither of them were before the grand jury, in regard to this case.

Among others, the defendant requested in writing the general affirmative charge, with hypothesis, which was refused.

The jury found a verdict for plaintiff for $50,000, and there was judgment accordingly. Defendant appeals.

Bradley, Baldwin, All & White, J. D. Rucker, and Wm. Douglas Arant, all of Birmingham, for appellant.

In an action for malicious prosecution, the burden is upon plaintiff to prove by a preponderance of evidence that defendant did not have probable cause in instituting prosecution against plaintiff. Lunsford v. Dietrich, 93 Ala. 565, 9 So. 308, 30 Am. St. Rep. 79; Gulsby v. L. & N., 167 Ala. 122, 52 So. 392; Hanchey v. Brunson, 175 Ala. 236, 56 So. 971, Ann. Cas. 1914C, 804. Recovery will not be permitted unless it is clearly established, as matter of law, that defendant acted without probable cause. Molton R. Co. v. Murchison, 212 Ala. 561, 103 So. 651; 18 R. C. L. 11; Hess v. Oregon Baking Co., 31 Or. 503, 49 P. 803; I. C. R. Co. v. Anderson, 206 Ky. 600, 268 S. W. 311. Whether or not a given state of facts constitutes probable cause is a question for the court. Molton R. Co. v. Murchison, supra; Gulsby v. L. & N., supra. As to what is probable cause, see Lunsford v. Dietrich, supra; Jordan v. A. G. S., 81 Ala. 225, 8 So. 191. If the evidence as to probable cause is undisputed, it is the duty of the court to instruct the jury peremptorily. Molton R. Co. v. Murchison, supra; Hess v. Oregon Baking Co., supra; Gulsby v. L. & N., supra. Defendant did not cause the prosecution, did not itself or by representative testify before the grand jury, and is not liable to plaintiff. The grand jury proceeding was the proximate, direct, and efficient cause of the prosecution, and the informant, who communicated with the solicitor, was not the prosecutor. It is immaterial whether the informant acted with or without malice, or had probable cause, nor is it essential that he made a full and fair statement to the solicitor in order to avoid liability. Cox v. Lauritsen, 126 Minn. 128, 147 N. W. 1093; Ryan v. Orient Ins. Co., 96 Vt. 291, 119 A. 423; Halladay v. State Bank, 66 Mont. 111, 212 P. 863; Malloy v. Chicago, etc., R. Co., 34 S. D. 330, 148 N. W. 598; Burgess v. Singer Mfg. Co. (Tex. Civ. App.) 30 S. W. 1110; F. E. C. R. Co. v. Groves, 55 Fla. 436, 46 So. 294; Ex parte Bain, 121 U. S. 1, 7 S. Ct. 781, 30 L. Ed. 849; Code 1923, §§ 8666, 8667, 8679, 8688. A defendant in an action

for malicious prosecution is not responsible for any abuse of process by the arresting officer, unless participated in or ratified by defendant. Marks v. Hastings, 101 Ala. 165, 13 So. 297; Motes v. Bates, 80 Ala. 385; Snead v. Jones, 169 Ala. 146, 53 So. 188. Communications between a citizen and a prosecuting attorney relating to infractions, or supposed or suspected infractions, of the criminal laws, are absolutely privileged from disclosure. Marks v. Beyfus, 25 L. R. Q. B. 494; Vogel v. Gruaz, 110 U. S. 311, 4 S. Ct. 12, 28 L. Ed. 158; In re Quarles & Butler, 158 U. S. 532, 15 S. Ct. 959, 39 L. Ed. 1080; Michael v. Matson, 81 Kan. 360, 105 P. 537, L. R. A. 1915D, 1; Worthington v. Scribner, 109 Mass. 487, 12 Am. Rep. 736; Schultz v. Strauss, 127 Wis. 325, 106 N. W. 1066, 7 Ann. Cas. 528; Gabriel v. McMullin, 127 Iowa, 426, 103 N. W. 355; Shinglemeyer v. Wright, 124 Mich. 230, 82 N. W. 887, 50 L. R. A. 129; Bazzell v. I. C. R. Co., 203 Ky. 626, 262 S. W. 966.

John Potts Barnes, Crampton Harris, and Hugo L. Black, all of Birmingham, for appellee.

When the evidence relating to probable cause is doubtful or conflicting, probable cause is a question of fact to be determined by the jury. Ewing v. Sanford, 19 Ala. 605; Veid v. Roberts, 200 Ala. 576, 76 So. 934; Goldstein v. Drysdale, 148 Ala. 486, 42 So. 744; Sloss Co. v. O'Neal, 169 Ala. 83, 52 So. 953; C. I. & C. Co. v. Wright, 20 Ala. App. 82, 101 So. 815. It is a question for the court only when the facts are undisputed and free from doubt. McLeod v. McLeod, 75 Ala. 483; Gulsby v. L. & N., 167 Ala. 122, 52 So. 392. Where a party tries a case on the theory that a certain issue is an issue of fact for the jury, so far as he is concerned the appellate court on appeal will consider it a question of fact. Grimes v. Cole, 133 Mo. App. 522, 113 S. W. 685; Whitney v. Broeder, 94 Neb. 305, 143 N. W. 228; Brown v. Gurney, 201 U. S. 184, 26 S. Ct. 509, 50 L. Ed. 717; Baker v. Kaiser (C. C. A.) 126 F. 317; State v. Blakemore, 275 Mo. 695, 205 S. W. 626. A partial, distorted, unfair, or false statement to the prosecuting attorney about a crime makes the informant an aider or abettor in the prosecution, if the prosecuting attorney institutes prosecution in reliance upon the statement. Amer. Sur. Co. v. Pryor, 211 Ala. 114, 99 So. 636; Steed v. Knowles, 79 Ala. 446; Low v. McDonald, 90 Wash. 122, 155 P. 748; Dennis v. Ryan, 65 N. Y. 385, 22 Am. Rep. 635. Plaintiff, in action for malicious prosecution, is entitled to recover such damage as physical suffering, wounded pride, humiliation, injury to reputation, and the like. Lunsford v. Dietrich, 86 Ala. 250, 5 So. 461, 11 Am. St. Rep. 37; Hawkins v. Collins, 5 Ala. App. 522, 59 So. 694; Plath v. Braunsdorff, 40 Wis. 107; Ambs v. Atchison, etc., R.

R. Co. (C. C.) 114 F. 317; Birmingham Bot. Co. v. Morris, 193 Ala. 627, 69 So. 85; Rule v. McGregor, 115 Iowa, 323, 88 N. W. 814.

This case having been submitted under Supreme Court rule 46, the opinion of the court was prepared by Mr. Justice SOMERVILLE:

[1] The general rule has been declared, based upon considerations of public policy and supported by many authorities, that, where a person gives information to the state's prosecuting officer charged by law with the duty of enforcing the criminal law, or the investigation and prosecution of probably committed crime, and that information tends to connect another with the commission of crime or the violation of the criminal law, and the informant states all the material facts bearing thereon within his knowledge, and leaves that officer to a discharge of his official duty and the exercise of his own judgment and responsibility, or, where such informant disclaims personal knowledge of the incriminating facts, or does not state the facts as of his own knowledge, and the officer thereafter brings the matter to the attention of the grand jury for their investigation of the facts upon probable cause in the premises, without more, the informant is not liable in an action for malicious prosecution under an indictment returned by that grand jury. That is to say, the matter being duly brought to the attention of the inquisitorial body or official for action on his or their own judgment and responsibility after an investigation of the facts on independent evidence as to the existence of probable cause; and the finding and return of the indictment not being induced by fraud, subornation of witnesses, suppression of testimony, or other like misconduct on the part of the defendant or its authorized agent, his action, in the premises, is referred to the lawful effort to punish a violation of the law; and in such a case the informant is not in any legal sense the responsible author of the prosecution, and cannot be held liable therefor. This is the consensus of judicial opinion, even where the independent action of the prosecuting officer has not been followed, as here, by the independent action of the grand jury. Ryan v. Orient Ins. Co., 96 Vt. 291, 119 A. 423; Halladay v. State Bank, 66 Mont. 111, 212 P. 863; Malloy v. Chicago, etc., R. Co., 34 S. D. 330, 148 N. W. 598; Burgess v. Singer Mfg. Co. (Tex. Civ. App.) 30 S. W. 1110; Fla. E. C. R. Co. v. Groves, 55 Fla. 436, 46 So. 294; Burnham v. Collateral Loan Co., 179 Mass. 268, 60 N. E. 617; 18 R. C. L. 17, § 7. A convincing analogy will be found in two of our own cases (involving false imprisonment, not malicious prosecution), wherein it is declared that, "if the [arresting] officer acts solely upon his own judgment and initiative, the defendant would not be responsible even though he had directed or requested such action, and even though he

were actuated by malice or other improper motive." Standard Oil Co. v. Davis, 208 Ala. 565, 94 So. 754; Rich v. McInerny, 103 Ala. 345, 15 So. 663, 49 Am. St. Rep. 32.

The following excellent statement of the reasons which underlie the rule, found in Ryan v. Orient Ins. Co., 96 Vt. 291, 119 Atl. 423, is worthy of quotation here:

"A question of vital importance in the administration of the criminal law is raised by the first ground of the motion. The question has never arisen in this jurisdiction, although it has with some frequency been before the courts of other jurisdictions in recent years. The decided cases generally deal with prosecutions based upon the affidavit or complaint of a private individual, in which case the person making the affidavit is usually regarded as the prosecutor and held liable as such. But under the present procedure for instituting criminal prosecutions in this state, where the complaint is made by a prosecuting officer elected for the purpose, a different situation arises. Prima facie the prosecution is instituted and conducted by the public prosecutor, and the plaintiff in a subsequent suit for malicious prosecution has the burden of showing that the defendant in such suit was directly responsible for the institution or continuance of the proceedings complained of. It is of public concern that a citizen having reason to believe, or even suspect, that a crime has been committed, be permitted to direct the attention of the prosecuting officer towards its investigation, without exposure to the peril of being held liable for malicious prosecution in case of a failure of conviction. The criminal law does not enforce itself, but requires the agency of some informant to put it in motion. It is sometimes said that the action for malicious prosecution is not favored in law, and hence has been hedged about by limitations more stringent than those in the case of almost any other act causing damage to another. A recovery is allowed only when the requirements limiting it have been fully complied with. Especially is this so where the suit is brought, for the institution of criminal proceedings against the plaintiff, as public policy favors the exposure of crime, which a recovery against a prosecutor obviously tends to discourage. 18 R. C. L. 11, and cases there collected. The principles governing the rights and liabilities of the parties to an action for malicious prosecution are a compromise between the right of the individual to be free from arrest or prosecution upon a charge of which he is innocent and the right of the community to be protected from crime. Burnham v. Collateral Loan Co., 179 Mass. 268, 60 N. E. 617.

"While a defendant in an action for malicious prosecution is sufficiently a prosecutor to sustain an action against him, if the prosecution to which the plaintiff is subjected is instituted by the state's attorney at the defendant's instance and request, something more is required than that the defendant be shown to have given information which set the machinery of the law in motion. Burnham v. Collateral Loan Co., supra. A defendant has not 'caused a prosecution' in the sense that renders him liable when he acts only in subordination to the prosecuting attorney and under the latter's directions; nor when he states the bare facts as to the plaintiff's conduct to such attorney, leaving him to judge of the propriety of proceeding with the charge, where the attorney does not act in any way under the direction of the informant or the influence of the information thus received. In the action for malicious prosecution, where the proceeding complained of was begun by another, it must affirmatively appear as a part of the plaintiff's case that the defendant was the proximate and efficient cause of such proceeding. McClarty v. Bickel, 155 Ky. 254, 159 S. W. 783, 50 L. R. A. (N. S.) 392; Thienes v. Francis, 69 Or. 165, 138 P. 490; Malloy v. Chicago, etc., R. Co., 34 S. D. 330, 148 N. W. 598; Western Nat. Bank v. White, 62 Tex. Civ. App. 374, 131 S. W. 828."

In that case, in discussing the effect given to the testimony of the prosecuting attorney, Hopkins, the court said on rehearing:

"Finally, what is said concerning the effect given Hopkins' testimony overlooks several important considerations. It is not claimed that there was any conflict in the evidence respecting what Hopkins did, but the point is made that a jury would not be bound to believe what he said, and would be at liberty to infer (against the fair import of his testimony) that the defendants instigated the prosecution and voluntarily furthered its continuance. Counsel fail to take into account the presumption attending official actions, which are presumed to be regular, unless the contrary is made to appear. Sargent v. Shepard, 94 Vt. 351, 111 A. 447. The presumption is, of course, rebuttable; but it stands until overcome by evidence. McKinstry v. Collins, 76 Vt. 221, 233, 56 A. 985. It cannot be removed by mere argument. The important, if not controlling, matters developed by Hopkins' testimony related to what he did. Starting with Hayes' written statement as a basis of investigation, he employed the means provided by law to determine whether there was probable cause for the prosecution. It must be presumed, the contrary not appearing, that his investigations disclosed probable cause. The fact that he thereupon issued the information and persisted in pressing the prosecution is sufficient of itself to show that he assumed the responsibility. That he in effect so testified merely confirms a fact otherwise established. We take occasion to call attention to these matters, although the point was not made at the argument."

The question is one of responsible causation, and, under all the authorities, and in accordance with general principles and sound public policy, the undisputed evidence in this case refutes the legal liability of this defendant.

This conclusion is in no wise affected by the consideration that this defendant desired that the plaintiff be indicted and punished, or sympathized with and aided Bohler, the Standard Oil Company's agent, in investigating the charge and conferring with the witnesses who had knowledge of the facts at first hand; or sympathized with and aided the prosecution of the case after the indictment was found. Nor is it of any significance that the defendant corporation, acting in these matters through its inspector, Keating, or any other of its officers, designedly and carefully refrained from doing anything

which might have rendered it liable as the instigator of the indictment. Such prudence is not culpable, nor subject to any just criticism.

[2] A co-operative design between Bohler and Keating, representing their principals, to bring all the facts of the case, through the witnesses who knew them at first hand, before the solicitor, to be by him presented to the grand jury for their independent action on that testimony, was in no sense a conspiracy to instigate a malicious prosecution. This defendant is not responsible for any statements made by Bohler, which it had a right to present to the solicitor, or to the grand jury, for whatever value it had, without incurring any liability on its own part as prosecutor, or as instigator of the prosecution.

In the consideration of this question, no part of the evidence has been overlooked; but there is nothing in it to change the essential facts of the case as above stated, or to show that the defendant surety company is legally responsible for the indictment and prosecution of the plaintiff. That responsibility must be placed where alone it belongs, upon the solicitor, and upon the grand jury that found the indictment.

For the reasons stated, a majority of the court—Justices SAYRE, THOMAS, BOULDIN, and the writer—are of the opinion that the general affirmative charge should have been given for the defendant, and that its refusal was error.

[3] On the former appeal, the court's conclusion to the contrary—the evidence being substantially the same—was founded upon a misconception of the testimony of Solicitor Seibles, as is now plainly apparent, and that conclusion is not controlling here.

[4] Defendant specifically objected to the following excerpt from the letter written in December, 1920, by the defendant's board chairman to the Standard Oil Company, which was offered as a whole by plaintiff:

"Prosecutions are difficult in the South, especially where thefts have been by employees of corporations, railroads, and oil companies, and local juries are very lenient with those who misappropriate property of corporations."

A majority of the court—ANDERSON, C. J., SAYRE, GARDNER, THOMAS, and BOULDIN, JJ., and the writer—are of the opinion that this matter was irrelevant to the issues, and probably highly prejudicial to the defendant, and that the trial court erred in overruling defendant's motion to exclude it.

[5] The general rule has been correctly declared to be that, when the accused person has been arrested and held in the custody of an officer of the law, the person who has caused the arrest cannot be held responsible for the officer's wrongful and abusive treatment of the prisoner, not authorized, instigated, or ratified by the prosecutor. Marks

v. Hastings, 101 Ala. 165, 13 So. 297; Snead v. Jones, 169 Ala. 143, 53 So. 188. See, also, Walling v. Fields, 209 Ala. 389 (7), 96 So. 471. The correlative of this rule is, of course, that the prosecutor is liable to the accused for all legally recognized elements of damage resulting to him from the proper and lawful acts of the officer in arresting, keeping, and handling the accused, if such acts are the natural and probable incidents of his arrest and custody under the existing conditions.

This rule is illustrated by the case of Birmingham Bottling Co. v. Morris, 193 Ala. 627, 69 So. 85, where it was held proper to allow the plaintiff to testify that other persons were present when he was arrested. It is, we think, impossible to reconcile this decision with the decision in Marks v. Hastings, supra, where it was held error to allow the plaintiff to answer "how many persons were present when the arrest was made."

Both of these rules are in fact but specialized forms of the general principle that limits liability to the proximate results of wrongful conduct, and we are all now of the opinion that the rule, though correctly stated in Marks v. Hastings, supra, was there misapplied.

[6] Here the plaintiff was allowed, over defendant's seasonable objection, to state that, after he had been arrested and handcuffed, he "went into the Crescent News dining room to get something to eat, and he [the officer in charge of him] wouldn't let me take the handcuffs off to eat." We cannot say, as a matter of law, that this particular conduct of the officer was wrongful or abusive of his authority in the premises. Whether it was, or was not, was a question of fact for the jury to determine under proper instructions, and hence the evidence was admissible, if that item of damage was comprehended in the special items of damage counted on in the complaint.

Among the statutory interrogatories propounded by plaintiff to defendant were the following:

"(75) State whether or not such claim adjuster, or any attorney, servant, agent, or employee for defendant gave any information to any prosecuting officer of the state of Alabama before June 1, 1921, with reference to any money alleged to be due by plaintiff to the Standard Oil Company, or any property alleged to be converted or embezzled by plaintiff which belonged to the said Standard Oil Company.

"(76) If so, who was such person, or who were such persons? What was their conversation with the defendant, and state to whom such person or persons gave such information, what was said by such persons or person, and what was said by such prosecuting officer, and who was present at the time?"

Defendant, over its objection that this matter was privileged from disclosure, was compelled to make answer. In this the writer thinks the trial court was in error. Such

evidence has been held inadmissible over and over again by the highest courts in the land.

In Vogel v. Gruaz. 110 U. S. 311, 316, 4 S. Ct. 12, 15, 28 L. Ed. 158, often cited, and regarded as a leading case on the subject, it was said:

"The matter concerned the administration of penal justice, and the principle of public safety justifies and demands the rule of exclusion. In Worthington v. Scribner, 109 Mass. 487 [12 Am. Rep. 736] an action for maliciously and falsely representing to the Treasury Department of the United States that the plaintiff was intending to defraud the revenue, it was held that the defendant could not be compelled to answer whether he did not give to the department information of supposed or alleged frauds on the revenue contemplated by the plaintiff. The principle laid down in that case was, that it is the duty of every citizen' to communicate to his government any information which he has of the commission of an offense against its laws; and that a court of justice will not compel or allow such information to be disclosed, either by the subordinate officer to whom it is given, by the informer himself, or by any other person, without the permission of the government, the evidence being excluded not for the protection of the witness or of the party in the particular case, but upon general grounds of public policy, because of the confidential nature of such communications. The authorities are collected and reviewed in that case."

In the Massachusetts case referred to it was further said by Mr. Justice Gray:

"The question now before us is not one of the law of slander or libel, but of the law of evidence; not whether the communications of the defendants to the officers of the treasury are so privileged from being considered as slanderous, as to affect the right to maintain an action against the defendants upon or by reason of them; but whether they are privileged in a different sense, so that courts of justice will not compel or permit their disclosure without the assent of the government to whose officers they were addressed. The reasons and authorities already stated conclusively show that the communications in question are privileged in the latter sense, and cannot be disclosed without the permission of the secretary of the treasury. And it is quite clear that the discovery of documents which are protected from disclosure upon grounds of public policy cannot be compelled, either by bill in equity or by interrogatories at law."

The decisions are so numerous, and their reasoning so conclusive, that the rule of exclusion in cases like this must be regarded as beyond the pale of controversy. Shinglemeyer v. Wright, 124 Mich. 230, 82 N. W. 887, 50 L. R. A. 129; Michael v. Matson, 81 Kan. 360, 105 P. 537, L. R. A. 1915D, 1; Gabriel v. McMullin, 127 Iowa, 426, 103 N. W. 355; Bazzell v. I. C. R. Co., 203 Ky. 626, 262 S. W. 966; In re Quarles et al., 158 U. S. 532, 15 S. Ct. 959, 39 L. Ed. 1080; Marks v. Beyfus, 25 L. R. Q. B. Div. 494 (the leading English case).

In the case of Sullivan v. Hill, 73 W. Va. 49, 79 S. E. 670, Ann. Cas. 1916B, 1115, the court recognizes the rule, but holds it inapplicable there. So, also, in the case of Cole v. Andrews, 74 Minn. 93, 76 N. W. 962, and Riggins v. State, 125 Md. 165, 93 A. 437, Ann. Cas. 1916E, 1117.

There are, as might be expected, a few cases in which the rule of exclusion has been denied. Granger v. Warrington (1846) 8 Ill. [3 Gilman] 299; Meysenberg v. Engelke, 18 Mo. App. 346 (contra, Pinson v. Campbell, 124 Mo. App. 260, 101 S. W. 621); Fite v. Bennett, 142 Ga. 660, 83 S. E. 515. Those cases, however, were based on the idea merely that there was no confidential relation of attorney and client, and took no account of the principle of public policy involved.

In State v. Rash, 2 Boyce (25 Del.) 77, 78 A. 405, the prosecuting attorney's informant was on trial for perjury committed on the trial of the accused, and on that issue the officer was allowed to testify as to the statements made to him by his informant. So, also, in People v. Roach, 215 N. Y. 592, 109 N. E. 618, Ann. Cas. 1917A, 410, statements made by a witness—a deputy sheriff—to an attorney (not a prosecuting attorney) were held admissible to contradict some of his testimony for the state. In Riggins v. State, supra, the evidence was admitted for the same purpose. Those cases are obviously not in point.

This rule of exclusion is not applicable to communications made to nonofficial persons; and hence, as held on the former appeal (211 Ala. 114, 99 So. 636), verbal communications and letters that passed between defendant, or its agent Keating, and the Standard Oil Company, or its agent Bohler, were admissible in evidence, if relevant and competent. The opinion on that appeal went too far, however, in holding that communications between defendant and the solicitor were not protected from disclosure.

The foregoing discussion of this question presents the views and opinion of the writer and Mr. Justice THOMAS. The other members of the court do not wish to commit themselves thereto, and hence the question is not here decided.

Many other questions are presented by the assignments of error argued in briefs of counsel, but we deem it unnecessary to decide them.

For the errors noted, the judgment will be reversed and the cause remanded for another trial in accordance with this opinion.

SAYRE, THOMAS, and BOULDIN, JJ., concur.

ANDERSON, C. J., and GARDNER, J., concur in the reversal, but hold that the general charge for defendant was properly refused.

BROWN, J., dissents.