This is a "sufficiency of the evidence" case. By motion for directed verdict, timely filed, with properly stated grounds, Defendant/Appellant City of Mobile challenged the sufficiency of Plaintiff/Appellee Dirt's evidence in support of its claim for breach of contract.
From our careful review of the record, we are convinced that the undisputed evidence discloses that Plaintiff failed to comply with the express terms of the subject contract, and thus no fact issue existed for the jury's determination. Because the trial judge erred in not granting Defendant City's directed verdict motion, we reverse and render.
 FACTS
Immediately after Hurricane Frederic struck the gulf coast on September 12, 1979, the City of Mobile contracted with various truck operators to gather and remove the storm's debris from the city and dump it in two excavated pits. On November 21, 1979, the City entered into a contract with Dirt, which provides:
 "8. The Contractor shall put dirt fill material over the areas used to pile collected debris which has been compacted and piled to a minimum depth of 12
feet. The Contractor is to be paid $4,032.50 per acre. The compacted dirt cover accomplished with the fill shall measure a minimum depth of six compacted inches and shall be so compacted as to permit loaded debris trucks, having a capacity of 40 or more cubic yards, to operate on the fill surfaces."
In 1981, Dirt informed the City that it had completed the contract's requirements and submitted a claim for payment. The City paid Dirt a total of $34,276, thus acknowledging that Dirt had complied with the contract provisions as to 8.5 acres. Dirt, however, maintained that it had completed the contract as to the entire 18.3 acres; thus, it sued the City, seeking payment for an additional 9.8 acres. The City, upon investigation, determined that Dirt had not complied with the contract as to any acreage.
The jury returned a verdict for Dirt in the amount of $25,094.48, half the amount sued for, plus interest. Having been denied directed verdict at the close of the evidence, the City then moved for judgment *Page 504 
notwithstanding the verdict. From the denial of that motion, the City appeals.
 OPINION
Defendant City argues that Dirt presented insufficient evidence to present a factual issue for the jury to decide. Thus, maintains the City, the trial court committed reversible error in not directing a verdict for the City and in allowing the case to go to the jury. In evaluating Defendant City's argument, we begin, as always in a directed verdict analysis, by viewing the evidence of record in the light most favorable to the nonmoving party. Ritch v. Waldrop, 428 So.2d 1 (Ala. 1982).
When we turn to the record, however, we find the following deposition testimony by Lamar Harrison, owner and president of Dirt:
 "Q All right, sir. Did you have any other means of reaching the height requirement of Paragraph 8 in mind when you signed this contract for the acres that were already covered by debris?
 "A The only thing I had in mind was to cover it and grade my pit back, Mr. Brigham. The depth never bothered me.
 "Q Does that statement mean that you intended to cover the debris at the height at which it lay on the day you signed this contract, regardless of what the height of the debris was?
 "`A You could probably say that, because I didn't pay that depth no mind. I knew, you know, approximately what the elevation was, zero up to 30 feet of fill, but I still didn't let the depth bother me. My intention was to cover what was there.
". . . .
 "Q Mr. Harrison, you have testified of what your intentions under the contract were. Did you have any different intentions to attempt to comply or not comply with the terms of Paragraph 8 between Cottage Hill and Wolf Ridge Road?
 "A. Mr. Brigham, the answer to all of that is going to boil right back down to me not reading the contract careful enough, if I even read it, that the only thing I had in my mind when I signed that contract was to cover that debris and put my pit back into a reasonable condition such as it was before we dumped the debris in there.
". . . .
"Q. What are you suing for, Mr. Harrison?
 "A. I am suing for the amount of coverage, regardless of what it compacted to.
". . . .
 "Q. All right, sir. Did you have anybody say anything to you that led you to believe that if you compacted debris that was only one foot high you would get $4,000 an acre for putting dirt on it.
 "A. I never said nobody told me anything of that. I told you that we had only talked about covering the debris. There never was anything said about compacting.
 "Q. All right. Then, you did not read the contract when you signed it, did you, Mr. Harrison?
 "A. As I stated before, I am at fault for not. And when I say I'm at fault, I'm really not being critical of myself or the ability that I have because it all relates back to the amazing amount of shrinkage that the debris had.
". . . .
 "Q. Did you read this contract and understand it sufficiently to comply with the contract before you signed it?
 "A. My answer is still that I would say that I did not read the contract to the extent that I ought to — that I had ought to have nor did I read it to the extent that I understand it now.
". . . .
 "Q. Is it your testimony then that the contract is not clear? Is that your testimony today?
 "A. No, sir. I wouldn't say that the contract is not clear.
 "Q. Then, is it your testimony the contract is clear on what the contractor, Dirt, Incorporated, had to do. . . .
 "A. Mr. Brigham, I'm not down here questioning anything that the contract *Page 505 
says. That contract is in black and white and I'll agree with you that if I had sat down and read the thing closely I could have understood everything in it at that time as well as I understand now.
". . . .
 "Q. You don't understand the contract; is that your testimony?
 "A. No. I understand what you're getting at as far as trying to disallow payment because the amount of compacted material.
"Q. What are we trying to get at?
 "A. Because the shrinkage went so much greater than any of us anticipated that there is no humanly way that we could have ended up with a 12 feet compacted debris.
 "A. Is that the reason why you did not have the 12 feet of compacted debris?
 "A. The reason I didn't have 12 foot is because of the shrinkage, yes, sir.
 "Q. Is that the sole reason — no — that is the sole reason, isn't it?
"A. Yes, sir.
". . . .
 "Q. So, you can't tell us anything else that caused you to fail to comply with the terms of the contract, is that correct?
". . . .
 "A. The shrinkage is the only reason I did not comply with the contract."
Dirt argues that this testimony has to be read along with the following testimony by Mr. Harrison, which, it contends, tends to show the required twelve feet of compacted debris:
 "Q. Now, at the time the pit was closed in the latter part of December of '79, how high was the debris stacked?
 "A. When they stopped dumping debris, we was in excess of 12 feet anywhere in the pit.
"Q. Okay. Anyhow — had that debris been compacted?
"A. Yes, it had been compacted.
"Q. How had it been compacted?
 "A. By taking a dozer and packing it against the existing debris just as hard as we could, and taking a front-end loader and stacking it and compacting it against the same debris, keeping an embankment going.
 "Q. Was it necessary under the circumstances to compact it laterally, from the sides?
 "A. Yes. We were forced to when we had to come off from the top and go down to the bottom and start dumping against the existing debris."
This testimony, however, does not modify or negate Mr. Harrison's previous deposition testimony that we have set out. It is clear that the twelve feet referred to in the above testimony is in reference to a time earlier than the date of final compacting of the debris and the application of the compact dirt cover, at which time the depth of the debris was less than half that required by the contract.
In sum, therefore, we can think of no clearer case of a "complete absence of proof on a material issue or where there are no controverted questions of fact on which reasonable people could differ." Deaton, Inc. v. Burroughs, 456 So.2d 771
(Ala. 1984). With the foregoing testimony by Dirt's officer to the effect that it did not comply with the provisions of the contract, no factual issue existed to be submitted to the jury. Thus, the trial court committed reversible error in submitting the case to the jury and in denying the City's motion for directed verdict.
REVERSED AND RENDERED.
TORBERT, C.J., and MADDOX, SHORES and BEATTY, JJ., concur. *Page 506